**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
TWO LOCKS, INC. d/b/a PREMIER SNACK
DISTRIBUTORS,

                  Plaintiff,

        -against-

KELLOGG SALES COMPANY d/b/a
KELLOGG SNACKS,

                Defendants.
--------------------------------------------------------X

**MEMORANDUM OF
DECISION & ORDER**
14-cv-5917 (ADS) (ARL)

**APPEARANCES:**

**Kaufmann, Gildin & Robbins, LLP**
*Attorney for the Plaintiff*
777 Third Avenue
New York, NY 10017
      By: David J. Kaufmann, Esq.,
          Kevin M. Shelley, Esq., Of Counsel

**Jenner & Block LLP**
*Attorney for the Defendant*
919 Third Avenue
New York, NY 10022
      By: Susan J. Kohlmann, Esq.,
          Jason P. Hipp, Esq., Of Counsel

**SPATT, District Judge**.

This cases arises from the attempt by Kellogg Sales Company, d/b/a Kellogg Snacks (the

"Defendant") to terminate a distribution agreement with Two Locks, Inc., d/b/a Premier Snack

Distributors (the "Plaintiff").

Presently before the Court is the Plaintiff's motion pursuant to Federal Rule of Civil

Procedure ("Fed. R. Civ. P.") 65 for a preliminary injunction restraining and enjoining the

Defendant from (i) terminating the distribution agreement with the Plaintiff; (ii) altering the

benefits due to the Plaintiff pursuant to the distribution agreement; (iii) disrupting or interfering

1

with the operations of the Plaintiff's business as a distributor of the Defendant's products; (iv)

taking any action adverse to Plaintiff's business interests; and (v) staying the Defendant's notice

of termination.

For the reasons set forth below, the Court denies the Plaintiff's motion for a preliminary

injunction.

## I. BACKGROUND

### A. Underlying Facts

#### 1. The Parties

The Defendant is a Delaware corporation with its principal place of business in Battle

Creek, Michigan.  (Compl. at ¶ 2.)  The Defendant manufactures a variety of cookies, crackers,

and other snack products, including well-known products such as Keebler crackers, Famous

Amos cookies, Cheez-Its, Nutri-Grain Bars, Rice Krispies Treats, and Kashi Granola Bars

(Zlam Decl. at ¶ 3.).

The Defendant utilizes different delivery systems to serve retail locations where its

products are sold.  (Id. ¶ 4.)  In some markets, the Defendant uses independent distribution

companies to service smaller stores, such as bodegas and specialty stores, which sell its products.

(Id.)  In particular, the Defendant delivers products from its warehouses to the independent

distributors' warehouses, and the independent distributors on its trucks then deliver the

Defendant's products to retail stores.  (Id.)

The Plaintiff is a New York corporation with its principal places of business in

Commack, New York.  (Compl. at ¶ 1.)  The Plaintiff is an independent distributor, which has

been distributing the Defendant's products in the New York metropolitan area since July 2000.

(Ceruto Decl. at ¶ 8.) Previously, the Plaintiff had agreements with companies other than the

Defendant to distribute snack products, including Stella D'Oro, Tastykake, Popcorn Indiana, Energy Club, Josephine's, and Delacre.  (Zahn Decl. at ¶ 7; see also Zahn Decl., Ex. A.) However, on June 30, 2014, when the Defendant sent a notice of termination to the Plaintiff, the only products that the Plaintiff distributed were the Defendant's products.  (Ceruto Decl. at ¶ 3.) Currently, the Plaintiff has the largest volume of sales of any of the Defendant's U.S. distributors.  (Id.)  In this regard, the Plaintiff "grosses $15 million [per year] solely from the [distribution] of [the Defendant's] snack products."  (Id. at ¶ 6.)

**2. The Parties' Negotiations for the 2008 Distribution Agreement**

Prior to entering into the 2009 distribution agreement, the parties negotiated distribution agreements with one year terms.  (Zahn Decl. at ¶ 9; Ceruto Decl. at ¶ 8.)  Each year the agreement in place would expire, and the parties would have to re-negotiate a new contract for the following year.  (Id.)

In late 2006, the parties started to negotiate the terms of an agreement that was to take effect in 2008 (the "2008 Agreement").  (Ceruto Decl. at ¶ 8.)  The terms of Section 2 of the 2008 Agreement relating to the Defendant's termination rights were seriously negotiated by the parties.  (Ceruto Decl. at ¶ 8.)

In particular, in an April 8, 2008 email to David J. Kaufmann ("Kaufmann"), the Plaintiff's counsel, and Marc Ceruto ("Ceruto"), President of the Plaintiff, Tara Harper ("Harper"), counsel for the Defendant, responded to comments made by Kaufmann with regard to a February 26, 2008 draft of the 2008 Agreement.  (Zahn Decl., Ex. C., at 4–5.)  With respect to paragraph 2 of the draft agreement, Kaufmann commented:

> The language you added at the end of Paragraph 2 - entitling Kellogg to terminate
> the agreement after one year - is, frankly, egregious. The understanding we
> reached was that Premier's renewal rights would be automatic if it annually
> satisfied certain performance thresholds. The understanding was not that Premier

would invest a fortune in its Kellogg operation only to find itself under the constant threat of immediate termination at any time after one year. We at this firm (which, as you know, represents countless numbers of our nation's leading franchisors) have to wonder just how sincere Kellogg's representations are if we reach such a clear understanding regarding automatic renewal in my conference room only to have that right utterly undermined in your draft a month later - and also wonder if Kellogg truly believes that its distributors are best incentivized to exploit the market for Kellogg with the specter of Kellogg taking over that lucrative business for itself once they do.

(Id. at 5.)  Harper responded to Kaufmann's comment as follows:

David- I merely referenced the provision that was already in the agreement in section 12, in section 2. We have to preserve the rights to terminate the contract if we go out of this type of business model. We are guaranteeing Premier the first year and then have the 90 day termination thereafter. We can date the contract effective as the date of signature to extend the 12 month period, but that is all we can do at this time. You did not strike the language in section 12, so I am not sure why you are objecting to it in section 2.

(Id.)

In an April 11, 2008 email to Harper and Ceruto, among others, Kaufmann responded:

"While we are disappointed that Kellogg will not provide the security of a multi-year agreement

that Premier feels it rightfully deserves, we are willing to accept the terms of THIS 2008

agreement, modified as suggested below, due to economic reasons."  (Id. at 3.)  With regard to

Harper's comments on paragraph 2 of the draft 2008 Agreement, Kaufmann stated:

As you suggested, the one year period during which there could be no termination except for cause should commence on date of execution, not January 1st. Further, Cheri told Marc Ceruto that following said one year period, a change could be effected such that termination could transpire only on 180 days notice (not the current 90 days).

(Id.)

In an April 22, 2008 email to Kaufmann and Ceruto, among others, Harper responded to

Kaufmann's comments on paragraph 2 of the draft: "My understanding is that Cheri told Marc

that she would check to see if we can offer 180 days, and we can not [sic] . . . . We understand

that you want a longer term but in keeping with company policies we have to keep these agreements to a calendar year." (Id. at 2–3.)

In a follow-up email on April 23, 2008 to the same group, Harper added, "As noted in point number 2 below the final document should have changed the term to a calendar year. It was determined by Kellogg that no one can have an agreement that extends beyond a calendar year. As such I should have attached an agreement consistent with the change that I pointed out below." (Id. at 2.)

In an email to Harper on the same day, Kaufmann responded: "It is not that simple. It was Kellogg that offered the full one year term in lieu of a contract which would be terminable only for cause and would automatically renew. Telling Premier on the day of signing that Kellogg has changed its mind and presenting a contract to Premier for its execution incorporating such change . . . is a fundamental breach of ethics[.]"

In an email to Kaufmann on April 24, 2008, Harper responded:

Yes, Premier is one of our largest distributor, however, they are part of a program and there are rules and laws that must be followed. We do not have an evergreen contract, and none of the distribution contracts are terminable only for cause . . . . In recognition of the relationship with Premier, and the fact that they are in a difficult market we have negotiated a contract that we do not negotiate, we have provided terms of assignment which we do not do, and we have extended the notice term to 90 days, as well as softened our non compete language.

(Id. at 1.)

### 3. The 2008 Distribution Agreement

The 2008 Agreement became effective on April 23, 2008. (Ceruto Decl., Ex. B.)

Paragraph 2 of the 2008 Agreement entitled, "Terms of the Agreement," provides:

This Agreement shall become effective as of the date hereof and shall continue for until December 31, 2008 . . . . After December 31, 2008, this [A]greement may be terminated by either party upon ninety (90) days written notice effective

on the date set forth in the notice, or until [the agreement] terminates in accordance with paragraph 12 herein.

(Id.)

### 4. The 2009 Distribution Agreement

On December 19, 2008, Ceruto sent an email to Kaufmann in which he attached the 2008 Agreement and asked, "Please see #2 TERM OF AGREEMENT[.] What do we need to do?" (Ceruto Decl., Ex. C.) On the same day, Ceruto sent an email to Jeff Bunzel ("Bunzel"), an employee of the Defendant, asking the same question. (Ceruto Decl., Ex. D.)

In an email to Ceruto and Kaufmann on the same day, Bunzel responded, "Marc [Ceruto], I had inquired already and we need to do nothing." (Id.) Ceruto responded to Bunzel's email later that day, "Simultaneously I sent the same question to David Kaufmann, he disagrees. He says we clearly have to execute another agreement based on the way it is written. If Kelloggs [sic] wants to have this auto renew it should be re-worded." (Id.)

Over the next several months, the parties met in-person several times to negotiate a successor agreement to the 2008 Agreement. (Id. at ¶ 15.) During "at least one of these in person meetings, [Ceruto] told [the Defendant's] representatives that having to sign a new Distributor Agreement every year was burdensome and requested, again, the auto-renewal provision." (Id.) According to Ceruto, "Bunzel agreed that meeting every year to sign a new agreement was not necessary, given [the Plaintiff's] performance, and that [the Defendant] would revise the . . . Agreement accordingly." (Id.)

On February 19, 2009, Bunzel sent an email to Ceruto with the subject, "Revised contract with rollover language." (Ceruto Decl. Ex. D.) In the email, Bunzel attached a draft of the 2009 Agreement and asked Ceruto to review it. (Id.) The proposed

agreement was nearly identical to the 2008 Agreement except for changes to Paragraph 2

reflected in bold:

2. TERM OF AGREEMENT

**Subject to Section 12 of this Agreement**, this Agreement shall become effective as of the date hereof and shall continue until December 31, 20**10, and shall continue in effect until either party terminates this agreement by providing the other party with written notice of termination at least ninety (90) days prior to such termination**. DISTRIBUTOR [Premier] shall have the right to enter into consecutive successor DSDD Distributor Agreements unless this (or any applicable successor) Agreement has been terminated or unless DISTRIBUTOR has committed a material breach of this (or any applicable successor) Agreement which remains outstanding as of the date that DISTRIBUTOR notifies COMPANY [Kellogg] of its desire to enter into a successor Agreement (as specified below) and which material breach COMPANY has not waived. . . . If DISTRIBUTOR wishes to exercise its right to enter into a successor DSDD Distributor Agreements, it will do so by executing COMPANY'S then-current form of DSDD Distributor Agreement, the terms of which may differ from the terms of this Agreement. ~~After December 31, 2009, this [A]greement may be terminated by either party upon ninety (90) days written notice effective on the date set forth in the notice, or until terminates in accordance with paragraph 12 herein.~~

(Id.) (emphasis added).

Section 12 of the new proposed agreement remained the same as Section 12 in the

2008 Agreement:

12. TERMINATION

(i) This Agreement may be terminated by either party at any time upon ninety (90) days written notice to the other for good cause (defined as either party's breach of this Agreement which is not cured within those times specified below) or a change in COMPANY's business that results in COMPANY no longer using Independent DSDD distributors in this territory, with the date of termination to be set forth in the notice or by mutual agreement.

(Id. at 10–11.) On February 24, 2009, the parties agreed to the changes proposed by

Bunzel, and the new successor agreement became effective (the "2009 Agreement").

### 5. The Defendant's Notice of Termination

In a June 30, 2014 letter (the "Notice of Termination") to Ceruto, Omar Zlam

("Zlam"), the Manager of Team Sales employed by the Defendant, wrote:

> Consistent with the terms of section 2 of the above referenced Agreement, this letter serves as 90 days' notice of Kellogg's intention to terminate the Agreement, effective September 30, 2014. If [the Plaintiff] is interested in discussing a successor agreement with Kellogg please notify us at your earliest convenience . . . .

(Zahn Decl., Ex. D.)

## B. Underlying Procedural History

After issuing the Notice of Termination, the parties engaged in negotiations for a

successor agreement.  On September 25, 2014, in light of the ongoing negotiations, the

Defendant agreed to extend the effective date for the termination of the 2009 Agreement to

October 15, 2014.  (Ceruto Decl. at ¶ 45; Zahn Decl. at ¶ 21.)

On October 8, 2014, the Plaintiff commenced this action by filing a complaint seeking a

declaratory judgment that the Defendant is not entitled to terminate the 2009 Agreement and a

permanent injunction enjoining the Defendant from terminating the 2009 Agreement on the basis

set forth in the Notice of Termination.  (Compl. at ¶ 67.)  The Plaintiff also sought monetary

damages and asserted common law claims for (i) breach of contract; (ii) unfair competition; (iii)

unjust enrichment; and (iv) promissory estoppel.

Subsequently, on October 8, 2014, the Defendant agreed to extend the termination date to

November 21, 2014 to give the parties additional time to negotiate a successor agreement.  (Zahn

Decl., Ex. I.)

After the parties failed to reach an agreement, on November 19, 2014, the Plaintiff

moved for a preliminary injunction and temporary restraining order ("TRO") enjoining the

Defendant from terminating the 2009 Distribution Agreement, among other requests.

On the same day, November 19, 2014, the parties appeared before the Court. The Defendant, on the record, agreed to keep the 2009 Agreement in place until the Court issued a decision on the present motion, thus rendering a TRO not necessary. (Dkt. No. 7.)

On December 11, 2014, the Court heard oral argument from both parties as to the Plaintiff's motion for a preliminary injunction.

## II. DISCUSSION

In the present motion, the Plaintiff argues that it is entitled to a preliminary injunction enjoining the Defendant from terminating the 2009 Agreement because (i) there is a high probability of irreparable harm to its business if the 2009 Agreement is terminated; (ii) it is likely that it will succeed on the merits of its claims for (a) breach of contract, (b) breach of an implied covenant of good faith, and (c) declaratory judgment; and (iii) the balance of hardships in this case tips decidedly toward granting injunctive relief.

### A. Legal Standards

To obtain a preliminary injunction under Fed. R. Civ. P. 65, the movant must demonstrate: "(1) that [it] will suffer irreparable harm absent injunctive relief, and (2) either (a) that [it] is likely to succeed on the merits, or (b) 'that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party.'" Moore v. Consol. Edison Co. of New York, 409 F.3d 506, 510 (2d Cir. 2005) (quoting No Spray Coalition, Inc. v. City of New York, 252 F.3d 148, 150 (2d Cir. 2001)). The Court has "'wide discretion in determining whether to grant a preliminary injunction,' as it is 'one of the most drastic tools in the arsenal of judicial remedies.'" Pivotal Payments, Inc. v. Phillips, No. CV 14-4910 (GRB), 2014 WL 6674621, at *3

(E.D.N.Y. Nov. 25, 2014) (quoting Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007)).

With respect to the first prong of the test, "[w]here there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." Moore, 409 F.3d at 510.

With respect to the second prong, the parties dispute which standard applies. The Defendant argues that the Plaintiff should be required to make a "clear showing" that it will succeed on the merits of its claims. (The Def.'s Mem. of Law at 8.) The Plaintiff contends that it is merely seeking to preserve the status quo by keeping the 2009 Distributor Agreement in place, and therefore, the Court should only require it to show that it is more likely than not that its claims will succeed on the merits at trial. (The Pl.'s Mem. of Law at 3–4.)

Courts in this Circuit have applied a higher standard — requiring the movant to make "clear showing" that its claims will succeed on the merits — in two situations. First, courts have required a movant to show a higher standard where the relief sought is mandatory rather than prohibitory, and in other words, seeks an order that "changes the status quo." Fishman ex rel. Fishman v. Daines, No. 09-CV-5248 (JFB), 2014 WL 4638962, at *5 (E.D.N.Y. Sept. 16, 2014) ("The other situation in which courts have required a more substantial showing of likelihood of success is where the preliminary relief sought is mandatory rather than prohibitory, and changes the status quo."); see also Wright v. New York State Dep't of Corr. & Cmty. Supervision, 568 Fed App'x 53 (2d Cir. 2014) ("However, we have required the movant to meet a higher standard where . . . an injunction will alter, rather than maintain, the status quo.").

Second, courts have required a movant to meet a higher standard where an "injunction will provide the movant with substantially all the relief sought and that relief cannot be undone

even if the defendant prevails at a trial on the merits." <u>Wright</u>, 568 Fed. App'x at 53-55 (citing

<u>Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.</u>, 60 F.3d 27, 33–34 (2d Cir. 1995)). "The latter

is sometimes referred to as the 'ultimate relief' exception." <u>Id.</u>

The Court need not decide whether to require the Plaintiff to meet this higher standard as

the Court finds that the Plaintiff has failed to meet the usual standard. As is set forth below, the

Court finds that the Plaintiff has failed to show that its claims are likely to succeed or that there

are sufficiently serious questions going to the merits to make its claims a fair ground for

litigation.

## B. As to Whether the Plaintiff's Claims Are Likely to Succeed on the Merits

In the present motion, the Plaintiff argues that there is a substantial likelihood of success

on the merits of its claims against the Defendant for (i) breach of Sections 2 and 12 of the 2009

Agreement; (ii) a declaratory judgment that the Defendant's attempt to terminate the 2009

Distribution Agreement is unauthorized by Section 2 of the 2009 Agreement; and (iii) breach of

an implied covenant of good faith by attempting to terminate the 2009 Agreement without a legal

basis. (The Pl.'s Mem. of Law at 8–14.)

All of these claims depend on the Court's resolution of the question as to whether Section

2 of the Agreement authorized the Defendant to terminate the Agreement. Therefore, the Court

will focus on this question in determining whether the Plaintiff's claims are likely to succeed on

the merits.

### 1. Choice of Law

As an initial matter, the Court must determine which state's law will govern the

Plaintiff's claims. The 2009 Agreement contains a choice of law provision: Section 15(vi)

provides, "This Agreement will be governed by, and construed under, the law of the State of Delaware." (Ceruto Decl., Ex. A, at 16.)

However, since jurisdiction in this case is premised on diversity of citizenship, the court applies the choice of law principles of the forum state, which in this case, is New York**,** to determine whether to enforce a choice of law provision. Lee v. Bankers Trust Co., 166 F.3d 540, 545 (2d Cir. 1999). Under New York's choice of law principles, the first question a court must address is "whether there is an actual conflict between the laws of the jurisdictions involved." Deykina v. Chattin, No. 12-CV-2678 (ARR), 2014 WL 4628692, at *3 (E.D.N.Y. Sept. 15, 2014) (quoting In re Allstate Ins. Co., 81 N.Y.2d 219, 597 N.Y.S.2d 904, 613 N.E.2d 936, 937 (N.Y. 1993)). If there is a conflict, "New York, courts follow the "substantial relationship" test, under which they will honor the parties' choice of law in a contract unless (1) the chosen state has no substantial relationship to the parties; or (2) applying the law of the chosen state would contravene a fundamental policy of a state that has a materially greater interest than does the chosen state." The Ayco Co., L.P. v. Frisch, No. 1:11-CV-0580 (LEK), 2013 WL 8291759, at *5 (E.D.N.Y. Jan. 17, 2013).

However, where the laws are not in conflict, the court can apply New York law even where there is a provision selecting another state's laws in the contract. Id. (citing Curley v. AMR Corp., 153 F.3d 5, 12 (2d Cir. 1998)); see also Harley v. Minerals Technologies Inc., No. 13-CV-954 (RJS), 2014 WL 5017830, at *3 (S.D.N.Y. Sept. 26, 2014) ("Where there is no actual conflict, a choice-of-law analysis is unnecessary and New York law will apply."); Blue Ridge Farms, Inc. v. Crown Equip. Corp., No. 01 CV 8460 (SJ), 2005 WL 755756, at *9 (E.D.N.Y. Mar. 28, 2005) ("In the absence of a 'material conflict' a court should bypass choice of law analysis and apply New York law . . . even when a dispute is governed by a contract

12

containing a choice of law provision.") (emphasis added); <u>Simon v. Philip Morris Inc.</u>, 124 F. Supp. 2d 46, 71 (E.D.N.Y. 2000) ("A court is free to bypass the choice of law analysis and apply New York law in the absence of a material conflict.").

Here, for purposes of the present motion, neither party claims that there is a conflict between New York and Delaware law with respect to the Plaintiff's contract claims. (<u>See</u> The Pl.'s Mem. of Law at 8 n.2) ("New York and Delaware law . . . are substantially identical with respect to the breach of contract claim asserted in the Complaint).

The Court has also not found any conflict with respect to the Plaintiff's claims underlying the present motion. <u>See</u> <u>Ahluwalia v. St. George's Univ., LLC</u>, No. 14-CV-3312 (ADS), 2014 WL 6674615, at *8 (E.D.N.Y. Nov. 25, 2014) (Spatt, J) ("Under New York law, the elements of a cause of action for breach of contract are (1) the existence of a contract, (2) performance of the contract by one party, (3) breach by the other party, and (4) damages suffered as a result of the breach.") (citation and internal quotation marks omitted); <u>VLIW Tech., LLC v. Hewlett-Packard Co.</u>, 840 A.2d 606, 612 (Del. 2003) ("In order to survive a motion to dismiss for failure to state a breach of contract claim, the plaintiff must demonstrate: first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff.") (citation omitted); <u>see also</u> <u>CCM Rochester, Inc. v. Federated Investors, Inc.</u>, No. 14-CV-3600 VEC, 2014 WL 6674480, at *6 (S.D.N.Y. Nov. 25, 2014) ("Under New York law, a covenant of good faith and fair dealing is implied in all contracts[.]") (internal quotation marks and citation omitted); <u>Dunlap v. State Farm Fire & Cas. Co.</u>, 878 A.2d 434, 441-42 (Del. 2005) ("Recognized in many areas of the law, the implied covenant attaches to every contract[.]") (citations omitted).

Under these circumstances, the Court will apply New York law to determine whether the Plaintiff's claims are likely to succeed. See Int'l Bus. Machines Corp. v. Liberty Mut. Ins. Co., 363 F.3d 137, 143 (2d Cir. 2004) ("In the absence of substantive difference, however, a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it.").

**2. Can the Defendant Rely on Section 2 to Terminate the Agreement?**

**a. The Parties' Interpretation of Section 2 of the 2009 Agreement**

The Defendant's June 30, 2014 Notice of Termination states, "Consistent with the terms of section 2 of the [2009] Agreement, this letter serves as 90 days' notice of Kellogg's intention to terminate the Agreement[.]" (Zahn Decl., Ex. D.)

In relevant part, Section 2 of the 2009 Agreement provides:

> Subject to Section 12 of this Agreement, this Agreement shall become effective as of the date hereof and shall continue until December 31, 2010, and shall continue in effect until either party terminates this agreement by providing the other party with written notice of termination at least ninety (90) days prior to such termination."

(Ceruto Decl., Ex. A, at 1.)

The Defendant's Notice of Termination does not allege that the conditions precedent to termination in Section 12 were the basis for its termination — that the Plaintiff breached the 2009 Agreement or the Defendant changed its business so that independent distributors are no longer necessary. Therefore, the Court must resolve whether the Defendant is permitted to terminate the 2009 Agreement under Section 2 without satisfying the conditions contained in Section 12.

The Plaintiff argues that the Defendant cannot terminate the 2009 Agreement without satisfying Section 12 because by inserting the language, "Subject to Section 12," the parties

unambiguously intended for all of the termination rights referenced in Section 2 to be subject to the provisions of Section 12. Accordingly, the Plaintiff argues that the Plaintiff cannot terminate the 2009 Agreement, as it purported to do in its June 30, 2014 letter to the Plaintiff, merely by providing written notice to the Plaintiff ninety days prior to termination. (Id. at 12.)

On the other hand, the Defendant argues that parties intended the language, "Subject to Section 12 of this Agreement," to only modify the first clause of Section 2, "this Agreement shall become effective as of the date hereof and shall continue until December 31, 2010," and not the second clause, "and shall continue in effect until either party terminates this agreement by providing the other party with written notice of termination at least ninety (90) days prior to such termination." (The Def.'s Mem. of Law at 9.) Therefore, under the Defendant's interpretation, Section 2 can be divided into two terms: (i) until December 31, 2010, the parties can only terminate the Agreement "[s]ubject to Section 12," i.e. for cause or if the Defendant stops using distributors; and (ii) after December 31, 2010, the parties may terminate the 2009 Agreement without cause for any reason so long as that party provides 90 days written notice. (Id.)

### b. Legal Standards

Under New York law, "[t]he cardinal principle for the construction and interpretation of contracts is that the intentions of the parties should control." Roswell Capital Partners LLC v. Alternative Const. Technologies, No. 08 CIV. 10647(DLC), 2009 WL 497578, at *2 (S.D.N.Y. Feb. 27, 2009) (quoting SR Intern. Business Ins. Co. v. World Center Properties, LLC, 467 F.3d 107, 125 (2d Cir. 2006)) (internal quotations and alterations omitted). In determining what the parties intended, "a court should look first within the 'four corners' of the document" and should "give effect to the 'plain and ordinary' meaning of its language." Muze, Inc. v. Digital On-Demand, Inc., 123 F. Supp. 2d 118, 128 n. 9 (S.D.N.Y. 2000) (citation omitted); see also

Roswell Capital Partners LLC, 2009 WL 497578 at *2 ("In ascertaining the purpose or intent of the parties, 'lest form swallow substance, [the] goal must be to accord the words of the contract their fair and reasonable meaning.'") (citing Sutton v. East River Sav. Bank, 55 N.Y.2d 550, 555, 450 N.Y.S.2d 460, 435 N.E.2d 1075 (1982)).

Significantly, "[a]n interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless is not preferred and will be avoided if possible." LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 206 (2d Cir. 2005) (internal quotation marks, citations, and alterations omitted). In addition, "'[w]here one interpretation is broader than another, courts should not apply the broader interpretation absent a clear manifestation of intent.'" Roswell Capital Partners LLC v. Alternative Const. Technologies, 2009 WL 497578 at *2 (quoting Bank of New York v. Amoco Oil Co., 35 F.3d 643, 662 (2d Cir. 1994)). However, "[t]he court must be careful not to alter the terms of the agreement. The parties having agreed upon their own terms and conditions, the courts cannot change them and must not permit them to be violated or disregarded." Roswell Capital Partners LLC, 2009 WL 497578 at *2 (quoting Metropolitan Life Ins. Co. v. RJR Nabisco Inc., 906 F.2d 884, 889 (2d Cir. 1990)).

Further, under New York law, "[e]xtrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous." RCJV Holdings, Inc. v. Collado Ryerson, S.A. de C.V., No. 11 CIV. 2854 (RA), 2014 WL 1870808, at *4 (S.D.N.Y. May 8, 2014) (quoting Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 750 N.Y.S.2d 565, 780 N.E.2d 166, 170 (2002)) (internal quotation marks omitted). "Ambiguity" exists where "a reasonably intelligent person viewing the contract objectively could interpret the language in more than one way." Topps Co. v. Cadbury Stani S.A.I.C., 526 F.3d 63, 68 (2d Cir. 2008) (citing Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan, 7 F.3d 1091, 1095 (2d Cir. 1993)); see also

X.M.S. Corp. v. Friedman, 948 F. Supp. 2d 319, 332 (S.D.N.Y. 2013) ("If reasonable minds could differ about the meaning of contractual language, however, such language is ambiguous."). Although "extrinsic evidence generally may not vary or contradict the terms of a fully integrated document, it may be used to interpret facially ambiguous language in the contract." Id. (citing Topps Co., Inc., 526 F.3d at 69).

### c. As to Whether Section 2 of the 2009 Agreement is Ambiguous

Here, Section 2 of the 2009 Agreement states, "Subject to Section 12 of this Agreement, this Agreement shall become effective as of the date hereof and shall continue until December 31, 2010, and shall continue in effect until either party terminates this agreement by providing the other party with written notice of termination at least ninety (90) days prior to such termination." (Ceruto Decl., Ex. A, at 1.) (emphasis added).

Courts have interpreted the "subject to" to impose a "condition precedent." See Cranpark, Inc. v. Rogers Grp., Inc., 721 F. Supp. 2d 613, 627 (N.D. Ohio 2010) rev'd on other grounds, 498 Fed App'x 563 (6th Cir. 2012) ("The language 'SUBJECT TO RGI SR. MGT. APPROVAL' clearly imposes a condition precedent."); 13 Williston on Contracts § 38:16 (4th ed.) ("Likewise, the words 'subject to' in a contract usually indicate a condition to one party's duty of performance and not a promise by the other."). Under New York law, a "condition precedent is an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises." Edelman Arts, Inc. v. Art Int'l (UK) Ltd., 841 F. Supp. 2d 810, 823 (S.D.N.Y. 2012) (quoting Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co., 86 N.Y.2d 685, 636 N.Y.S.2d 734, 660 N.E.2d 415, 418 (1995)).

Here, the parties agree that "Subject to Section 12" imposes a condition precedent. However, they disagree as to how broadly the parties intended for it to apply to the termination rights set forth in Section 2. The Plaintiff contends that the parties intended the language, "Subject to Section 12," to make all of the termination rights set forth in Section 2 subject to the conditions set forth in Section 12. (The Pl.'s Mem. of Law at 10.) The Defendant argues that the parties only intended, "Subject to Section 12," to apply to the first clause of the first sentence in Section 2, "this Agreement shall become effective as of the date hereof shall continue until December 31, 2010," and not the second clause, "and shall continue in effect until either party terminates this agreement by providing the other party with written notice of termination at least ninety (90) days prior to such termination." (The Def.'s Mem. of Law at 10.)

The Court notes that at first blush, both parties' interpretations appear plausible. However, several cannons of construction militate toward adopting the Defendant's interpretation. In particular, when faced with two interpretations of a provision, courts generally prefer the narrower interpretation absent a clear manifestation of intent. <u>Bank of New York v. Amoco Oil Co.</u>, 35 F.3d 643, 662 (2d Cir. 1994) ("Where one interpretation is broader than another, courts should not apply the broader interpretation absent a clear manifestation of intent.").

Here, the Plaintiff's interpretation of "Subject to Section 12" is broader than the Defendant's interpretation because the Plaintiff contends that the parties intended this language to make all of the termination rights discussed in Section 2 "subservient" to the specific conditions for termination described in Section 12. (The Pl.'s Mem. of Law at 10.) The Defendant contends that the parties only intended "Subject to Section 12" to apply to the first clause of the sentence describing the parties termination rights through December 31, 2010.

18

Therefore, the Court is inclined to adopt the Defendant's more narrow interpretation of Section 2.

More importantly, the Plaintiff's interpretation of "Subject to Section 12" would render the second clause of the first sentence of Section 2 meaningless. In particular, the second clause of this sentence provides that the Agreement "shall continue in effect until either party terminates this agreement by providing the other party with written notice of termination at least ninety (90) days prior to such termination." In other words, this clause gives either party the right to terminate the 2009 Agreement for any reason upon 90 days' written notice. If this clause were made "[s]ubject to Section 12," it would eliminate that general termination right because Section 12 only permits a party to terminate the 2009 Agreement under two limited circumstances – "for good cause" or "a change in COMPANY's business that results in COMPANY no longer using Independent DSDD distributors in this territory." Therefore, making the second clause of the first sentence of Section 2 "[s]ubject to Section 12" would render it superfluous.

Indeed, at oral argument, Kaufmann appeared to concede that his interpretation would render much of the language in Section 2 superfluous: "[T]he changes [the Defendant] made in that first sentence, the one that says, it will continue in effect until either party terminates this agreement, by providing 90 days' notice, but that's all subject to section 12. <u>The rest of the language [in Section 2], Judge, is just carryover language now which is – was rendered superfluous by the change that [the Defendant] made.</u>" (Dec. 13, 2014 Oral Argument Tr. 30:5–17.) (emphasis added).

On the other hand, the Defendant's interpretation gives effect to all of the language in Section 2 of the 2009 Agreement by making termination subject to the conditions set forth in "Section 12" until December 31, 2010, while preserving the parties' right to terminate the

agreement upon 90 days' written notice for any reason after December 31, 2010.  See Ferguson v. Hannover Ruckversicherungs-Akteiengesellschaft, No. 04 CIV. 9254 (PKL), 2007 WL 2493692, at *14 (S.D.N.Y. Aug. 21, 2007) ("Courts will not interpret a contract or a provision of a contract so as to leave the contract or provision 'without force and effect.'") (citation omitted).

In response, the Plaintiff contends that the Defendant's interpretation of Section 2 would render Section 12 of the Agreement superfluous.  (The Pl.'s Reply Mem. of Law at 10.)  The Court disagrees.

Construing Section 2 to afford either party the right to terminate the 2009 Agreement without cause after December 31, 2010 does not affect or otherwise inhibit a party's right to terminate the 2009 Agreement based on the conditions set forth in Section 12 at any point after the Agreement becomes effective.  See Morse/Diesel, Inc. v. Trinity Indus., Inc., 67 F.3d 435, 439 (2d Cir. 1995) ("[T]he entire contract must be considered, and all parts of it reconciled, if possible, in order to avoid an inconsistency.") (quoting Cruden v. Bank of New York, 957 F.2d 961, 976 (2d Cir.1992)).  For example, Section 12(iii) gives the Defendant the right to terminate the Agreement if the Plaintiff fails to cure a material breach after five days written notice. (Ceruto Decl., Ex. A, at 11.)  If the Court were to adopt the Defendant's interpretation of Section 2, the Defendant would have (i) the right to terminate the 2009 Agreement within five days under Section 12 if the Plaintiff fails to cure a material breach; and (ii) have the right terminate the 2009 Agreement pursuant to Section 2 of the Agreement on 90 days' notice without cause after December 31, 2010.  There is nothing inconsistent about affording the Defendant the right to terminate the 2009 Agreement under these distinct and separate circumstances.  Indeed, interpreting the 2009 Agreement in this way is consistent with the requirement that the Court make a "reasonable effort . . .  to harmonize all of its terms."  See India.Com, Inc. v. Dalal, 412

F.3d 315, 323 (2d Cir. 2005); see also Cameron Int'l Trading Co. v. Hawk Importers, Inc., No. 03-CV-02496 (JS), 2010 WL 4568980, at *4 (E.D.N.Y. Nov. 2, 2010) aff'd, 501 F. App'x 36 (2d Cir. 2012) ("Effect and meaning must be given to every term of the contract, and reasonable effort must be made to harmonize all of its terms.").

Where, as here, a court is faced with two interpretations of a contract, courts have avoided adopting an interpretation that renders clauses of the contract meaningless or superfluous. See, e.g., LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 206 (2d Cir. 2005) (internal quotation marks, citations, and alterations omitted) ("An interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless is not preferred and will be avoided if possible."); see also Bristol-Myers Squibb Co. v. Matrix Labs. Ltd., No. 13-CV-3437, 2014 WL 4977326, at *3 (2d Cir. Oct. 7, 2014) ("If the word 'export' could bear the meaning that [the Plaintiff] desires, the additional language in Section 8.1 would be superfluous. This Court will not adopt an interpretation that has 'the effect of rendering at least one clause superfluous or meaningless . . . if possible.'") (citation omitted); Lorterdan Properties at Ramapo I, LLC v. Watctower Bible & Tract Soc'y of New York, Inc., No. 11-CV-3656 (CS), 2012 WL 2873648, at *13 (S.D.N.Y. July 10, 2012) ("I cannot say as a matter of law that that is the correct interpretation, because if it were, paragraph 4(a)—requiring payment of the $9.5 million upon a determination to proceed—would be superfluous, given that paragraph 4(b) already provides that the payment must be made if Defendant does nothing within the Two–Year Period.").

Therefore, in light of the plain meaning of its terms, the canons of construction, and considering the contract as a whole, the Court finds that the Defendant's interpretation of Section 2 is the only reasonable interpretation.

### d. As to the Extrinsic Evidence

The Court does not find Section 2 to be ambiguous as a matter of law. Therefore, the Court need not address extrinsic evidence of the parties' intent. See RCJV Holdings, Inc., 2014 WL 1870808 at *4 ("'Extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous . . . .'") (quoting Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 750 N.Y.S.2d 565, 780 N.E.2d 166, 170 (2002)). However, even if the Court were to find Section 2 to be ambiguous, the Court notes that the extrinsic evidence presented by both parties is consistent with the Defendant's interpretation of Section 2 of the 2009 Agreement.

"[W]hen ambiguity exists and the resolution of the ambiguity hinges on such extrinsic matters as the credibility of witnesses or documents or upon choosing one among several reasonable inferences that may be drawn from such extrinsic evidence, a jury, and not a court, should decide what meaning is to be ascribed to the contract." Bank of Taiwan New York Agency v. Granite State Ins. Co., No. 03 CIV.0682 (DAB), 2003 WL 21540664, at *7 (S.D.N.Y. July 9, 2003) (citing Chase Manhattan Bank, N.A. v. Keystone Distributors Inc., 873 F. Supp. 808, 811 (S.D.N.Y. 1994)). However, "[t]he appraisal of the value or existence of extrinsic evidence is for the court as a matter of substantive law." Uniroyal, Inc. v. Home Ins. Co., 707 F. Supp. 1368, 1375 (E.D.N.Y. 1988); accord S. New Jersey Rail Grp., LLC v. Lumbermens Mut. Cas. Co., No. 06CIV.4946(LAK), 2007 WL 2296506, at *9 (S.D.N.Y. Aug. 13, 2007) ("However, it is the Court's role to determine the value or existence of extrinsic evidence produced by the parties.").

As an initial matter, the Plaintiff contends that to the extent that the Court finds Section 2 of the Agreement to be ambiguous, the Court should apply the principle, *contra proferentem*, and construe the ambiguity against the Defendant who drafted Section 2 of the Agreement.

However, the principle *contra proferentem* does not apply in situations where, as here, both parties are sophisticated entities of equal bargaining power. <u>Catlin Speciality Ins. Co. v. QA3 Fin. Corp.</u>, No. 10 CIV. 8844 (LGS), 2014 WL 2990520, at *3 (S.D.N.Y. July 2, 2014) ("*Contra proferentem* does not apply where contracts are negotiated by sophisticated parties of equal bargaining power."); <u>Cummins, Inc. v. Atl. Mut. Ins. Co.</u>, 56 A.D.3d 288, 290, 867 N.Y.S.2d 81, 83 (1st Dep't 2008) ("The doctrine of *contra proferentem* does not apply as the evidence submitted on the motions shows . . . that plaintiff is sophisticated and was instrumental in crafting various parts of the agreement."); <u>Westchester Fire Ins. Co. v. MCI Commc'ns Corp.</u>, 74 A.D.3d 551, 902 N.Y.S.2d 350, 351 (1st Dep't 2010) ("Nor is there a need to resort to *contra proferentum*, which, in any event, would be inapplicable to this sophisticated policyholder."). Accordingly, the Court declines to apply *contra preferentem* to the instant case.

The Plaintiff next contends that extrinsic evidence of the parties negotiations indicates that in amending the 2009 Agreement, the parties intended to eliminate the language giving either party the right to terminate the agreement "upon ninety (90) days written notice." (The Pl.'s Reply Mem. of Law at 12.) Again, the Court disagrees.

Prior to the 2009 Agreement, the 2008 Agreement governed the parties' business relationship. Section 2 of the 2008 Agreement provides, "This Agreement shall become effective as of the date hereof and shall continue for until December 31, 2008 . . . . <u>After December 31, 2008, this [A]greement may be terminated by either party upon ninety (90) days written notice effective on the date set forth in the notice, or until terminates in accordance with paragraph 12 herein</u>." (Ceruto Decl., Ex. B.) (emphasis added).

None of the emails attached by the parties as exhibits to their papers suggest that the parties intended to eliminate the last sentence of Section 2 of the 2008 Agreement in the 2009

Agreement. To the contrary, the Plaintiff appeared to be exclusively concerned with the question of whether the agreement would automatically renew subject to the termination provisions in Section 2 of the 2008 Agreement. For example, in a December 19, 2008 email to Bunzel, Ceruto wrote, "Please see #2 Term of Agreement What do we need to do?" (Ceruto Decl., Ex. C.) Bunzel responded, "I had inquired already and we need to do nothing." (Ceruto Decl., Ex. D.) Ceruto later responded, "I sent the same question to David Kaufmann, he disagrees. He says we clearly have to execute another agreement based on the way it is written. If Kelloggs [sic] wants to have this auto renew it should be re-worded." (Ceruto Decl., Ex. D.) Taken together, these emails give rise to the inference that the change made to Section 2 in the 2009 Agreement was precipitated by the Plaintiff's desire to make clear that Section 2 of the agreement provided for the automatic renewal of the parties' business relationship.

In addition, the parties did not eliminate from Section 2 of the 2009 Agreement the language in Section 2 of the 2008 Agreement giving the parties the right to terminate upon written notice. Rather, the Defendant re-arranged it: Section 2 of the 2009 Agreement provides, "Subject to Section 12 of this Agreement, this Agreement shall become effective as of the date hereof and shall continue until December 31, 2010, and shall continue in effect until either party terminates this agreement by providing the other party with written notice of termination at least ninety (90) days prior to such termination." (Ceruto Decl., Ex. D, at 1.) (emphasis added). This re-arrangement of language suggests that at the very least, the parties intended to preserve their right to terminate the agreement upon written notice and not to wholly eliminate the provision as the Plaintiff contends.

The Plaintiff also relies on the representations in Ceruto's declaration that the changes made to Section 2 were based on the parties' agreement that the 2009 Agreement could only be

"terminated by [the Defendant] only" on the bases set forth in Section 12 – i.e. "(i) for cause, or

(ii) in the event [the Defendant] . . . eliminat[ed] [its] independent distributors in the New York

City metropolitan area." (Ceruto Decl. at ¶ 18.) However, the Court does not find Ceruto's

representations to be particularly probative, especially in light of the significant documentary

evidence which supports the Defendant's more limited interpretation of Section 2. See Solar &

Envtl. Technologies Corp. v. Zelinger, 726 F. Supp. 2d 135, 145 (D. Conn. 2009) ("Insofar as

the Court is required to consider their testimony as parol[e] evidence regarding the meaning of

the Know–How Transfer Agreement, the Court does not find their conclusory statements to be

particularly helpful or persuasive."); Endurance Am. Specialty Ins. Co. v. Century Sur. Co., No.

13 CIV. 5538 (AJP), 2014 WL 4555697, at *10 (S.D.N.Y. Sept. 15, 2014) ("Thus, even when a

contract is ambiguous, if the parol[e] evidence offered by the parties does not resolve that

ambiguity, or after opportunity to do so the parties do not offer extrinsic evidence to resolve the

ambiguity, the Court must construe the contract as a matter of law on a summary judgment

motion.")

 Therefore, the Court finds that, as a matter of law, both the plain language of Section 2 of

the 2009 Agreement and the extrinsic evidence proffered by the parties tends to show that the

parties intended to preserve the Defendant's ability to terminate the agreement upon 90 days

written notice after December 31, 2010. Since the Defendant issued a proper and permissible

Notice of Termination on June 30, 2014 pursuant to Section 2 of the Agreement, the Court

further finds that the Plaintiff is not likely to succeed, nor is there a substantial question, as to the

merits of its claims for (i) breach of contract; (ii) breach of an implied covenant good faith; and

(iii) a declaratory judgment.

**C. As to the Irreparable Harm and the Balance of Equities**

The Court finds that the Plaintiff has failed to establish a likelihood of success, or a substantial question, as to the merits of its contractual claims. Therefore, the Court need not reach the Plaintiff's arguments with respect to the balance of equities or irreparable harm. See Greenlight Capital, L.P. v. Apple, Inc., No. 13 CIV. 900 (RJS), 2013 WL 646547, at *13 (S.D.N.Y. Feb. 22, 2013) ("Although the Court concludes that [one of the plaintiffs] would be similarly unable to meet his burden regarding the remaining factors relevant to the preliminary injunction analysis—irreparable harm, balance of equities, and public interest—the Court need not reach those questions given his failure to establish the first element, likelihood of success on the merits."); Madison Square Garden, L.P. v. Nat'l Hockey League, No. 07 CV 8455 (LAP), 2007 WL 3254421, at *9 (S.D.N.Y. Nov. 2, 2007) aff'd, 270 F. App'x 56 (2d Cir. 2008) ("Because MSG has failed to demonstrate a likelihood of success on the merits or a sufficiently serious question going to the merits, I do not reach the issues of whether the League's fine on the Rangers constitutes irreparable injury or whether the balance of hardships tips decidedly toward the team."); McDavid Knee Guard, Inc. v. Nike USA, Inc., 683 F. Supp. 2d 740, 744 (N.D. Ill. 2010) ("If the moving party fails to demonstrate either [irreparable harm or likelihood of success on the merits], then a district court considering a motion for preliminary injunction need not proceed further with its analysis to deny the preliminary injunction motion."); Wright v. Giuliani, No. 99 CIV. 10091 (WHP), 2000 WL 777940, at *10 (S.D.N.Y. June 14, 2000) aff'd, 230 F.3d 543 (2d Cir. 2000) ("Because plaintiffs have failed to show a clear or substantial likelihood of success on the merits, this Court need not reach whether they have established irreparable harm."); Davidson v. Scully, 914 F. Supp. 1011, 1016 (S.D.N.Y. 1996) ("The Court does not consider whether plaintiff can show irreparable harm from denial of the preliminary injunction

because the court finds that the requested relief is unrelated to the merits of plaintiff's lawsuits and, even if it were related, plaintiff would not be able to show likelihood of success on the merits."); <u>United Cerebral Palsy Associations of New York State, Inc. v. Cuomo</u>, 783 F. Supp. 43, 53 (N.D.N.Y.) aff'd, 966 F.2d 743 (2d Cir. 1992) ("The Court, having declined to issue a preliminary injunction on the ground that movants have failed to demonstrate a likelihood of success on the merits of their claims, does not reach the issue of irreparable harm.").

### III. CONCLUSION

For the foregoing reasons, the Plaintiff's motion for a preliminary injunction is denied.


**SO ORDERED.**
Dated: Central Islip, New York
December 19, 2014


<u>/s/ *Arthur D. Spatt*</u>
ARTHUR D. SPATT
United States District Judge